UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

HEATHER WEATHERS                           CIVIL ACTION NO. 06-1042

VERSUS                                     JUDGE MELANÇON

LAFAYETTE PARISH SCHOOL                    MAGISTRATE JUDGE HILL
BOARD, ET AL

**MEMORANDUM RULING**

Before the Court is defendants' Motion for Summary Judgment and Memorandum in Support thereof [Rec. Doc. 27], plaintiff's Memorandum in Opposition to Summary Judgment [Rec. Doc. 29], defendants' Reply to plaintiff's Memorandum in Opposition [Rec. Doc. 34], and plaintiff's Supplemental Memorandum in Opposition [Rec. Doc. 37]. For the reasons that follow, defendants' Motion for Summary Judgment [Rec. Doc. 27] will be **GRANTED**.

**I.  BACKGROUND**

Prior to Hurricane Katrina, Heather Weathers ("Weathers" or "plaintiff") was employed by the Orleans Parish School Board as itinerant gifted and talented art teacher.[1] Outside of school, Weathers produced "contemporary, feminist art" which she displayed on her personal website.[2] Weathers admits that her art may not be appropriate for all ages, and, on her website, clearly displays a warning that visitors should be at least eighteen years old

---

[1]  *Complaint* [Rec. Doc. 1], pg. 2; *Motion for Summary Judgment* [Rec. Doc. 27], Exhibit "B," *Depo. of Weathers*, pgs. 12-13.

[2]  *Complaint* [Rec. Doc. 1], pg. 3.

to view some of her works.³

On August 29, 2005, Hurricane Katrina ravaged the Gulf Coast forcing hundreds of thousands of people, including plaintiff, to evacuate from the City of New Orleans and other low lying coastal areas. As a result of the evacuation, Weathers temporarily settled in Lafayette, Louisiana. Upon arriving in Lafayette, plaintiff contacted the Lafayette Parish School Board ("LPSB" or "school board") seeking employment with their gifted and talented program.⁴ LPSB informed plaintiff that there were no available openings in their gifted and talented program but directed her to a job fair being held by the school board to fill other positions that had become available as a result of the influx of students from the hurricane affected areas.⁵

Plaintiff attended the job fair and interviewed for positions with Comeaux High School ("Comeaux") and other schools in the district.⁶ Weathers was offered and accepted a position with LPSB as a substitute teacher at Comeaux.⁷ She attended an abbreviated orientation on the Sunday following the job fair and began teaching at Comeaux the next morning. During the course of her first week at Comeaux, some of her students asked

---

³ *Id.*

⁴ *Motion for Summary Judgment* [Rec. Doc. 27], Exhibit "B," *Depo. of Weathers*, pgs. 17-18.

⁵ *Id.*, pgs. 18-19.

⁶ *Id.*, pgs. 22-24.

⁷ After the job fair, the administration of LPSB contacted Weathers and offered her a job as a substitute teacher. However, this offer was never considered, approved, or denied by the school board. *Motion for Summary Judgment* [Rec. Doc. 27], Exhibit "C," *Depo. of Craig*, pg. 20.

2

plaintiff to introduce herself.[8] To appease the students, plaintiff told the students about herself including that she was an artist who produced art that was not suitable for children.[9] On the Thursday of Weathers' first week, a student identified as Aaron S. allegedly presented a letter to Vice-Principal David LeJeune ("LeJeune") informing LeJeune of the existence of plaintiff's website and the comments she made to the class about her art.[10] LeJeune shared this information with Principal Joseph Craig ("Craig") who spoke with the student and investigated his claims.[11] The next day, Craig called Weathers into his office and informed her that he would no longer utilize her services at Comeaux.[12]

Plaintiff filed the instant action against Superintendent James Easton ("Easton") and Craig, in their official capacities,[13] and LPSB alleging that her employment was terminated in violation of her First Amendment rights to free speech and expression and that she was denied due process as guaranteed under the Fourteenth Amendment of the United States Constitution.[14] Weathers voluntarily dismissed her due process claims, but continues to

---

[8] *Motion for Summary Judgment* [Rec. Doc. 27], Exhibit "B," *Depo. of Weathers*, pg. 36.

[9] There is some dispute about whether plaintiff informed the students about her website, but for the purposes of this motion, the Court will view all of the facts in the light most favorable to the non-moving party and will presume that plaintiff did not specifically mention her website to the class.

[10] *Motion for Summary Judgment* [Rec. Doc. 27], Exhibit "C," *Depo. of Craig*, pg. 52.

[11] *Id.*

[12] *Motion for Summary Judgment* [Rec. Doc. 27], Exhibit "B," *Depo. of Weathers*, pgs. 18-19.

[13] Plaintiff only names Craig and Easton as defendants in their official capacities. No individual liability is alleged. *Complaint* [Rec. Doc. 1], pg. 2. The import of this distinction is explained more fully below.

[14] *Complaint* [Rec. Doc. 1], pg. 2.

assert a cause of action under 42 U.S.C. §1983 for the alleged violation of her First Amendment rights.[15] Defendants filed a Motion for Summary Judgment [Rec. Doc. 27] asserting that plaintiff's remaining claims must fail as a matter of law.[16]

## II.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (*en banc*).  Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Id*.  If the moving party fails to carry this burden, his motion must be denied. If he succeeds,

---

[15]   *Plaintiff's Voluntary Motion to Dismiss All Due Process Claims against Defendants* [Rec. Doc. 21].

[16]   In their Response to Plaintiff's Memorandum in Opposition to Summary Judgment [Rec. Doc. 34], defendants allege that plaintiff's claims must fail because the alleged actions were not taken by a "final policymaker."  Plaintiff urges the Court not to consider this argument because it was not raised in the initial Motion for Summary Judgment.  However, defendants asserted this affirmative defense in their Answer to plaintiff's complaint [Rec. Doc. 13] and plaintiff has had adequate opportunity to address this defense in its Supplemental Memorandum in Opposition to Summary Judgment [Rec. Doc. 37].  Accordingly, as it is a threshold legal matter, the Court will consider defendants' argument and plaintiff's response thereto.

however, the burden shifts to the non-moving party to show that there is a genuine issue for trial.[17] *Id*. at 322-23. Once the burden shifts to the respondent, he must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Celotex Corp.*, 477 U.S. at 324; Fed.R.Civ.Pro. 56(e). The responding party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970); *Little*, 37 F.3d at 1075. There must be sufficient evidence favoring the non-moving party to support a verdict for that party. *Anderson*, 477 U.S. at 249; *Wood v. Houston Belt & Terminal Ry.*, 958 F.2d 95, 97 (5th Cir. 1992). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact,

---

[17] Where the nonmoving party has the burden of proof at trial, the moving party does not have to produce evidence which would negate the existence of material facts. It meets its burden by simply pointing out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. To oppose the summary judgment motion successfully, the non-moving party must then be able to establish elements essential to its case on which it will bear the burden of proof at trial. A complete failure of proof by the nonmoving party of these essential elements renders all other facts immaterial. *Id*. at 322.

however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. LAW & ANALYSIS

### A. Municipal Liability

Plaintiff alleges that the defendants are liable to her under 42 U.S.C. § 1983.[18] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Municipalities and other local governmental units, including school boards, may only be sued under §1983 if the plaintiff's alleged deprivation of rights stems from the municipality's unconstitutional or illegal policies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The United States Supreme Court has stated:

> [T]he language of §1983, read against the background of the [ . . . ] legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under §1983 on a *respondeat superior* theory. *Monell,* 436 U.S. at 591 (emphasis included).

---

[18] *Complaint* [Rec. Doc. 1], pg. 3-4.

Continuing, the Court noted ". . . it is [only] when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §1983." *Id.* at 694. To prevail against LPSB on her claims under §1983, then, plaintiff must first show that the alleged deprivation of rights was a result of an official school board policy or that Craig possessed sufficient authority to make official policy of the school board on the issue of substitute teacher employment.

Plaintiff does not maintain that her alleged deprivation of rights was the result of an official school board policy. Rather, she alleges that Craig was conferred final policymaking authority by the school board on the issue of substitute teacher employment.[19] The determination of whether an official has final policymaking authority is a question of state law to be decided by the judge, not a question of fact for the jury to resolve. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), (*citing St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1998)). In making this determination, a court is required to look not only at the positive law of the state, but also at the "'custom or usage' having the force of law." *Id*.

In *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241 (5th Cir. 1994), the United States Fifth Circuit Court of Appeals considered the case of Norman Jett ("Jett"), a Caucasian athletic director and head football coach who brought §1983 and §1981 actions against a public school district and an African-American principal alleging discrimination in his

---

[19] *Supplemental Memorandum in Opposition to Summary Judgment* [Rec. Doc. 37], pg. 2.

reassignment. The principal recommended that Jett be relieved of his duties as athletic director and head football coach after Jett made several controversial comments. *Jett*, 7 F.3d at 1242. Based on the principal's recommendation, the superintendent transferred plaintiff to another school. Thereafter, Jett filed suit alleging discrimination and violation of his constitutional rights of equal protection and free speech. *Id.* After much litigation, including review and remand by the United States Supreme Court, *see* 491 U.S. 701 (1989), the Fifth Circuit found that, under Texas law, neither the principle nor the superintendent were final policymakers and the school district had not delegated final policymaking authority to them. *Id.* at 1245.

The Fifth Circuit, citing *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), and *St. Louis v. Praprotnik*, 485 U.S. 112 (1988), reiterated the Supreme Court's holding that there is a distinction between those with *final decision making* authority and those with *final policymaking* authority. "The fact that a particular official - even a policymaking official - has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Jett*, 7 F.3d at 1247 (*citing Pembaur*, 475 U.S. at 484). The court offered an example of this distinction:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although

> similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability. *Id*. (*citing Pembaur*, 475 U.S. at 484 & n.12) (*emphasis supplied*).

Finding that the superintendent lacked final policymaking authority, the Fifth Circuit remanded the case to the district court with instructions to enter judgment in favor of the school district in all respects. *Id*. at 1251.

In *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595 (5th Cir. 2001), the Fifth Circuit was again presented the question of whether a principal or superintendent constituted a final policymaker of a school district. There, both the principal of the school and superintendent of the school district recommended that plaintiff's employment be terminated. Plaintiff alleged that the recommendation was in retaliation for her failure to support the reelection of the incumbent superintendent. *Beattie*, 254 F.3d at 599. The Fifth Circuit, under Mississippi law, found that employment decisions were the sole province of the school board. *Id*. at 603. As in *Jett* and the current case, plaintiff argued that the principal and superintendent had been delegated authority to act as policymaker on behalf of the school board. *Id*. The court, however, found that there was no delegation in part because the board oversaw any actions taken by the parties. *Id*. Thus, the court dismissed the action against

the school board. *Id.* at 606.

Most recently, in the case of *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377 (5th Cir. 2007), a public school teacher who unsuccessfully sought a position as a middle school assistant principal brought a §1983 action against the school district and superintendent claiming a deprivation of constitutional rights. In that case, plaintiff alleged that she was denied the position by the district superintendent because she refused to enroll her children in the public school system. *Barrow*, 480 F.3d at 379. Again finding that Texas law delegates employment decisions solely to the local school board, the court held that the superintendent, though he may be given final *decision* making authority under the statute, was not a final *policymaker* under Texas law. *Id.* at 381. As plaintiff could not allege that the local school board acted with improper motives, the court affirmed the district court's grant of summary judgment to the school district. *Id*. at 383.

As in Texas and Mississippi, city and parish school boards in Louisiana, such as LPSB, have the sole power and authority to "[ . . . ] select teachers and all other certified personnel from recommendations made by the city or parish superintendent." La. Rev. Stat. § 17:81; La. Admin. Code Title 28, pt. CXV, §303. Louisiana jurisprudence counsels that, "[t]he general rule, succinctly stated, is that legislative and discretionary powers devolved by law on a public board or governing body politic cannot be delegated or referred to the discretion and judgment of its subordinates or any other authority." *Johnson v. Sabine Parish Sch. Bd.*, 140 So. 87, 89 (La. App. 2 Cir. 1932). Selection and employment of teachers,

including substitute or temporary teachers, is a discretionary, as opposed to ministerial, power. While "[e]ach city and parish school board is authorized to adopt rules and regulations for its own governance," such rules and regulations must be "consistent with law and the regulations of [the Louisiana Board of Elementary and Secondary Education]." La. Admin. Code Title 28, pt. CXV, §303. Accordingly, as a matter of Louisiana state law, the sole and final policymaker on the issue of teacher employment in Lafayette Parish is the Lafayette Parish School Board.[20]

Despite the statutory language to the contrary, plaintiff argues that LPSB Policy GBRJ-R delegates the school board's authority to hire substitute teachers to school principals.[21] Plaintiff avers that Policy GBRJ-R provides that "[t]he securing of substitute teachers shall be the responsibility of the principal," and allows the principal to "select and

---

[20] In a recent advisory opinion, the Office of the Attorney General for the State of Louisiana addressed this specific issue. Louisiana State Representative Ernie Alexander posed the question:

> Can the administration of the Lafayette Parish School System ("Administration") put displaced students in our schools, give employment to displaced teachers and other school staff in temporary substitute positions, and incur expenditures to accomplish these objectives without the prior approval of the Lafayette Parish School Board?

In response, the Attorney General opined that the hiring of teachers is a non-delegable duty of the local school board. La. Atty. Gen. Op. No. 06-0185. In contrast, citing the specific language of the enabling statute, the Attorney General found that a local school board may delegate the authority to enroll students since the statute provides that "[ . . . ] the board may exercise this responsibility directly or may delegate its authority to the superintendent of education or other person or persons employed by the board." *Id* citing La. Rev. Stat. § 17:104. Such language is absent from the provision providing local school boards the power and authority to hire and retain teachers. La. Rev. Stat. § 17:81.

While the opinions of the Attorney General are not binding and do not constitute law, the Court finds the Attorney General's opinion on this issue persuasive in this matter.

[21] *Supplemental Memorandum in Opposition to Summary Judgment* [Rec. Doc. 37], pg. 2.

contact substitutes and make arrangements for obtaining their services." Weathers contends that, through this policy, the school board delegated its statutory power to govern substitute teacher employment to school principals and mandated that the principals create their own policies for securing substitute teachers. This argument is disingenuous for two reasons. First, for the reasons stated above, if such a policy existed, it would be null and void as contrary to clear and unequivocal state statutory and administrative law. *See supra*. Second, and more apropos, it purposefully ignores the stated requirement in Policy GBRJ-R that the principal select the substitute from a list pre-approved by the Human Resources Division of the school district. Under plaintiff's misreading of the policy, one would assume that Craig could have simply walked out the schoolhouse doors and randomly selected a substitute teacher from general populous without the approval or review of the school board. This is simply not the case and plaintiff is, at best, remiss in her characterization of the quoted policy.[22]

Plaintiff attempts to support her argument of delegation by directing the Court's attention to the case of *Brady v. Fort Bend County*, 145 F.3d 691 (5th Cir. 1998). There, a county was held liable for a sheriff's employment decisions. It is true that *Brady* states that, although a municipality may be the final policymaker as to employment decisions generally, where a particular area of those decisions are delegated to another entity, that entity becomes

---

[22] It also bears stating that plaintiff's argument hinges on a written *policy* adopted by the school board concerning the hiring of substitute teachers. The mere existence of this policy demonstrates that the school board, and not the principal or superintendent, acted as the final policymaker on the issue of substitute teacher employment.

the final policymaker. *Brady,* 145 F.3d at 699. However, in *Brady*, the delegation to the sheriff was statutory in nature - not merely a policy of the county. In contrast, here, the statute mandates that the board shall make the final policy, as well as final decisions, on the employment of teachers. Louisiana law does not allow a school board to delegate this responsibility and any policy purporting to do so would be null and void. Consequently, the Court finds *Brady* to be distinguishable and inapposite to the facts of this case.

In the current case, LPSB took no action whatsoever on the employment of Weathers because the issue of Weathers's employment never came before the board for proper consideration. Accordingly, as the board did not take any action as to Weathers and because any action taken by others was not pursuant to an unconstitutional school board policy, LPSB is not liable to plaintiff under §1983. Further, if Weathers's rights were violated by Easton or Craig individually, LPSB is not liable to Weathers under the theory of *respondeat superior*. Thus, all of plaintiff's claims against the school board will be dismissed with prejudice.

### B. Liability of Superintendent Easton & Principal Craig

Plaintiff also names Superintendent Easton and Principal Craig, in their official capacities, as defendants in this action.[23] Importantly, no personal or individual liability is alleged on the part of either Craig or Easton.[24] To understand the importance of this fact, a

---

[23] *Complaint* [Rec. Doc. 1], pg. 2.

[24] *Id.*

review of the distinction between individual and official capacity suits is warranted.

Individual capacity suits seek to impose personal liability upon a governmental official for actions he takes under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In contrast, official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Id.* (*citing Monell*, 436 U.S. at 539 n. 55). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. [ *citation omitted* ]. It is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* (*citing Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)) (*emphasis supplied*). Applying these precepts to this case, Craig and Easton, in their official capacities, represented LPSB. As LPSB obviously had notice of the action and an adequate opportunity to respond, plaintiff's suit is to be treated solely as an action against the school board since no allegations of individual liability were contained in plaintiff's complaint. Therefore, for the reasons previously set forth, plaintiff's claims against Easton and Craig must also be dismissed as a matter of law.

### C. First Amendment Claims

Though purely an academic exercise, the Court notes that had plaintiff been able to survive the determination of the threshold issue, this Court would have been inclined to deny defendants' motion for summary judgment because a material issue of fact exists concerning what speech led to Craig's action. In the recent case of *Garcetti v. Ceballos*, ---- US ----, 126

S. Ct. 1951 (2006), the Supreme Court explained the law on First Amendment claims by public employees. It stated:

> As the Court's decisions have noted, for many years "the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment-including those which restricted the exercise of constitutional rights." *Connick*, [461 U.S. 138, 143 (1983)]. That dogma has been qualified in important respects. *See id.*, at 144-145. The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *See, e.g., Pickering,* [391 U.S. 563, 568 (1968)]; *Connick, supra,* at 147; *Rankin v. McPherson*, 483 U.S. 378, 384 (1987); *United States v. Treasury Employees*, 513 U.S. 454, 466 (1995).
>
> *Pickering* provides a useful starting point in explaining the Court's doctrine. There the relevant speech was a teacher's letter to a local newspaper addressing issues including the funding policies of his school board. 391 U.S. at 566. "The problem in any case," the Court stated, "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*, at 568. The Court found the teacher's speech "neither [was] shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Id.*, at 572-573 (*footnote omitted*). Thus, the Court concluded that "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.*, at 573.
>
> *Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *See id.*, at 568. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. *See Connick, supra, at 147*. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for

treating the employee differently from any other member of the general public. *See Pickering*, 391 U.S. at 568. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

To be sure, conducting these inquiries sometimes has proved difficult. This is the necessary product of "the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors ... to furnish grounds for dismissal." *Id.*, at 569. The Court's overarching objectives, though, are evident.

When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. *See, e.g., Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign"). Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. *Cf. Connick, supra*, at 143 ("[G]overnment offices could not function if every employment decision became a constitutional matter"). Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

At the same time, the Court has recognized that a citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. *See, e.g., Connick, supra*, at 147 ("Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government").
*Garcetti*, 126 S. Ct. at 1957-58.

In this case, there is adequate evidence to believe that Craig's actions may have been

motivated solely or primarily by Weathers's website. When "speaking" through her website, Weathers was arguably speaking as a private citizen on matters of public concern.[25]  Thus, if Craig's actions had been motivated by the website, it would have been incumbent upon to the defendants to show that they possessed an ". . . adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 126 S. Ct. at 1957 (*citing Pickering*, 391 U.S. at 568).  In the alternative, defendants would be required to show that they would have taken the same action even absent the protected speech.  As these are fact based inquiries that would necessarily involve determinations of credibility of the witnesses and weighing of the evidence by the trier of fact, summary judgment would not have been appropriate.  However, because a plaintiff may not run home before she reaches first base, this discussion does not change the ultimate result as plaintiff's case fails on a threshold issue of law.

## IV.  CONCLUSION

For the reasons stated herein, the defendant's Motion for Summary Judgment [Rec. Doc. 27] will be **GRANTED** and all of plaintiff's §1983 claims against all of the defendants will be **DISMISSED WITH PREJUDICE**.

---

[25]  At best, the determination of whether plaintiff was speaking on a matter of public concern would present a separate material issue of fact in this case.